We see no error in this trial. The judgment will therefore be affirmed.

## ELLIOTT et al. v. BROOKS.

### No. 2489.

Court of Civil Appeals of Texas. Eastland.

Dec. 22, 1944.

Rehearing Denied Jan. 19, 1945.

Harrell & Bowers, of Breckenridge, for appellants.

Blanton & Blanton, of Albany, for appellee.

GRISSOM, Justice.

Bertram A. Elliott and Ray Elliott filed this suit against Burton Brooks to compel specific performance of an alleged written contract whereby Brooks agreed to sell to the Elliotts a 145 acre tract and a 46.83 acre tract of land. Trial was to the court. Judgment was rendered for defendant. Plaintiffs have appealed.

Plaintiffs alleged that on December 13, 1943, defendant was the owner of said tracts aggregating 191.83 acres. That on said date defendant and plaintiffs entered into a written contract upon the following terms and conditions: Plaintiffs, acting

through their agent, W. G. Webb, offered to purchase said land at $30 per acre cash with delivery of possession on January 1, 1944; that plaintiffs' proposition was submitted to defendant in writing about December 13th, and defendant answered in writing a few days thereafter that he would sell at $30 per acre cash; that plaintiffs, about the 21st of December, 1943, acting through their said agent, tendered a deed to defendant to be executed by him and his wife conveying said property to plaintiffs, and offered to pay defendant $5,754.90 upon execution and delivery of said deed, but defendant refused to execute the deed.

Defendant denied that he made any contract in writing with plaintiffs on December 13, 1943, and alleged that he made no contract with plaintiffs for the sale of his land. He alleged that in 1942 he employed Webb & Webb, real estate agents, to find a satisfactory buyer for said land who would execute a contract, the terms and provisions of which were to be agreed upon between Brooks and a purchaser to be found by Webb & Webb. Defendant alleged in detail communications between defendant and Webb & Webb prior to December 1943. That in March, 1943, the Webbs wrote defendant that they had an offer of $25 per acre, with half the royalty reserved; that, if satisfactory to defendant, they would send a contract to him for his approval. Defendant alleged that on June 19, 1943, Webb & Webb wrote him, stating they had a party who wanted to look "at your place on Deep Creek at $30 per acre," and inquiring whether defendant would sell at that price and whether possession could be had when the sale was closed, and stated, "Of course, if there is a crop on the place, the agreement would be had with the buyer and present renter." Defendant alleged that when he received said letter he knew that his agents, Webb & Webb, had been negotiating with James Overton, and, believing the contemplated sale was to Overton, with whom he was on friendly terms, and that all the terms of sale could be agreed upon with Overton, defendant made the following notation on said letter and returned it to Webb & Webb: "Mr. Webb: I would take $30.00 for the place but would be the first of the year before I could turn it over. Bert Brooks."

Defendant alleged that Webb & Webb on April 2, 1943, had written to Overton

in substance that Brooks had listed the land with them at $25 per acre, but had raised his price to $30 per acre; that Brooks might take less if the buyer would take possession in January, 1944, "the buyer getting the third and fourth of crops * * *." Defendant further alleged that on November 4, 1943, Webb & Webb wrote him asking if he still desired to sell the land for $30 per acre after he had leased the land for oil, and suggesting that Brooks would want to reserve one-half of the royalty and that possession on January 1st should be acceptable to a buyer if the land sold. He further alleged that he and Overton were on friendly terms; that the Overtons were desirable neighbors; that Overton and his wife had made a visit to the place and discussed buying the land with defendant; that defendant had promised the Overtons that if he sold the place he would sell to them; that when his agents wrote him on December 13th defendant believed, and had good reason for believing, that the prospective buyer was Overton; that, on December 13, 1943, Webb & Webb wrote Overton they could sell him the Brooks 195 acres at $30 per acre, with a reservation of half the "non-participating royalty"; that the land was leased for oil and gas; that they had submitted an offer for another party; that the Webbs were of the opinion that another person who had gone wth the Overtons to look at Brooks' land was not in position to buy; that terms could be had on part of the consideration, but it would take more than $1,000 cash; that Webb & Webb, on the same day, December 13, 1943, also wrote defendant as follows:

"Albany, Texas.
"December 13, 1943

"Mr. Bert Brooks,
"Moran, Texas.
"Dear Bert:

"We have today talked with a party in regards to buying your place, and he says that he will give $30.00 per acre cash with delivery January 1st next, but he does not want you to reserve any royalty or mineral rights.

"We told him that you told us that you wanted to reserve one-half of the royalty, but he says $30.00 per acre was too much for it with this reservation, and that he would not give that much for it with a reservation of any kind.

"We told him we would submit it; so when you get this letter call us over the

phone—call us collect—as to whether this offer is acceptable or not.

"Yours very truly,
"W. G. Webb
"Webb & Webb."

In this connection, defendant alleged he had no information that Bertram Elliott was trying to buy his land; that Bertram A. Elliott was unfriendly toward defendant and his family; that Brooks and his wife would not have considered selling the property to Elliott, but, believing that the party with whom Webb & Webb were negotiating for the sale of the property was Overton, defendant wrote on the bottom of the last mentioned letter: "Mr. W. G. Webb: Dear Sir: I believe I will let you sell the place for $30.00 cash. Bert Brooks."

Defendant alleged that it was understood and agreed between him and his agents, Webb & Webb, that any contract of sale would have to be approved and executed by defendant and his wife, and that said agents had no authority to execute any written contract of sale for him, but were authorized only to find a satisfactory buyer who would be willing to execute a contract with defendant and his wife, that would be satisfactory to them in all of its terms and provisions. Defendant denied that he had ever entered into a contract, either written or oral, with plaintiffs, or signed any such contract; that he never heard of either of the plaintiffs in connection with the sale of his land until December 21, 1943, when Webb & Webb sent him a deed, written by them, conveying the land to the Elliotts for a recited cash consideration of $30 per acre. Defendant alleged there was no meeting of the minds on any alleged contract for the sale of the land by him to the Elliotts; that there had been no agreement as to the terms and conditions of such a proposed sale; that the only time defendant had signed his name to any document relating to the sale of said land was his notation upon the letters to his agents dated June 19, 1943, and December 13, 1943; that when he made said notations he understood the correspondence related to a possible sale of the land to Overton. Defendant further alleged that there was no written contract for the purchase of said land; that there was no consideration for the alleged contract for the sale of land sued on by plaintiffs; "and that such claims of plaintiffs come within the Statute of Frauds and defendant pleads the Statute of Frauds in bar of such claims."

At the request of plaintiffs the court filed findings of fact and conclusions of law, as follows:

Findings of fact:

"1. Early in 1943 the defendant employed Webb & Webb, Real Estate Agents, to help him find a satisfactory buyer for a tract of land containing 191.87 acres near Moran, upon which defendant's son with his wife and daughter had lived for 15 years. Defendant also owned another small place near Moran, upon which he and his wife lived, and he also owned two tracts of land between Ibex and Moran.

"2. Webb & Webb on one of their printed agency cards listed with typewriter the owner as 'Bert Brooks,' his address as 'Moran, Texas,' the description of the land as '191.87 acres near Moran, Four room house, large hole of water, on road,' and the price at '$25.00 per acre,' and the 'encumbrance payable W. H. Stephens,' which was all the information they wrote upon said card. Defendant did not sign this card, but later when a prospective buyer named James Overton agreed to pay $25.00 per acre for the land, which defendant refused to accept, the defendant with a pencil marked out the '$25' and wrote above it '$30,' but did not sign his name to the card, and Webb & Webb with pencil then made the following notation on the card: 'April 1943 raised price to $30.00 with half royalty.'

"3. It was understood between defendant and Webb & Webb that when they found a satisfactory buyer, the defendant would execute his own contract with the buyer, and that Webb & Webb had no authority to execute the contract for defendant.

The court further found (4) that Webb & Webb wrote defendant on March 24, 1943, that they had sold "your 195 acres near Moran at $25.00 per acre all cash, this being the price you listed it with us for sale." They insisted that Brooks advise them at once whether this offer was acceptable, and also as to the matter of possession. In said letter Webb & Webb stated: "Of course, you had a right to change your price or take it off the market since listing it with us, * * *,". The court further found (5) that on June 19, 1943, Webb & Webb wrote defendant as follows: "A party will be here next week

and wants to look at your place on Deep Creek at $30.00 per acre. Please write us by return mail if you will deliver the place at that price and if possession could be had as soon as the sale is closed. Of course, if there is any crop on the place, the agreement would be had with the buyer and the present renter." In this connection the court found: "Believing that the prospective buyer referred to was James Overton, with whom defendant and his wife were on friendly terms, and that all terms of sale could be agreed upon between them, defendant wrote upon the bottom of the above letter 'Mr. Webb: I would take $30.00 for the place but would be the first of the year before I could turn it over. Bert Brooks', which was the first document of any kind defendant had ever signed, and he returned the above letter to Webb & Webb, who on April 2, 1943, had written the following letter: * * *." The letter referred to was addressed to Overton and stated that the writer had been to see the owner of the 195 acres, "which we told you could be had for $25.00 per acre"; that the Webbs had a listing by Brooks at that price; that Brooks said he had sent word to Webb & Webb to take it off the market, but that they had not received the message; that Brooks had raised his price to $30 per acre; that he might take less if the buyer would take possession in January, 1944, the buyer getting a third and fourth of the crops. The court found that (6) on November 4, 1943, Webb & Webb wrote defendant inquiring whether or not Brooks still desired to sell his land for $30 per acre, since he had leased it for oil. The agent stated they did not want any mix-up again, and would appreciate Brooks advising if defendant had changed his price or taken the land off the market. They asked Brooks not to send word by anyone, but to let them know over his signature what he was willing to do. They suggested that Brooks would want to reserve one-half of the royalty and that possession on January 1, 1944, would be acceptable to a buyer. The court found (7) that Webb & Webb, as agents for Brooks, caused James Overton and wife to inspect defendant's land, and that Brooks promised Overton and his wife "that if he ever sold the land at $30 per acre, he would sell to them." The court further found (8) that on December 13, 1943, Webb & Webb wrote Overton that they had authority to deliver the Bert Brooks' 195 acres at $30 per acre with reservation of one-half the nonparticipating royalty; that the place was leased at $1 per acre; that possession could be had on January 1st; that the Webbs had submitted the offer for another party; that terms could be had, but it would take more than $1,000 cash. The court found that on the same day this letter was written to Overton, that Webb & Webb wrote defendant as follows:

"Albany, Texas,
"December 13, 1943.
"Mr. Bert Brooks,
"Moran, Texas.
"Dear Bert:
"We have today talked with a party in regards to buying your place, and he says that he will give $30.00 per acre cash with delivery January 1st next, but he does not want you to reserve any royalty or mineral rights.

"We told him that you told us that you wanted to reserve one-half of the royalty, but he says $30.00 per acre was too much for it with this reservation, and that he would not give that much for it with a reservation of any kind.

"We told him we would submit it; so when you get this letter call us up over the phone—call us collect—as to whether this offer is acceptable or not.

"Yours very truly,
"W. G. Webb
"Webb & Webb".

In connection with this letter the court found: "Believing that the prospective buyer referred to in said letter was James Overton, the defendant wrote on the bottom of the above letter and returned it to Webb & Webb, the following: 'Mr. W. G. Webb: Dear Sir: I believe I will let you sell the place at $30.00 cash. Bert Brooks.'" The court further found (9) that said offer of $30 was made by Bertram A. Elliott; that plaintiffs were never mentioned to defendant as prospective buyers; that defendant and his wife erroneously believed that Bertram A. Elliott had prevented their son from obtaining a sixty day furlough to look after his crop; that defendant would not have sold the land to Bertram A. Elliott at any price. The court further found (10) that on December 16, 1943, Webb & Webb wrote Bertram Elliott as follows:

"Bert Brooks has accepted your proposition for his place East of you at $30.00 per acre cash with no reservation of mineral rights or royalty.

"Please advise us at once to whom the deed should be made, as we want to get it signed at the earliest possible date. If they were to strike an oil well it might effect it somewhat, but believe Bert will stay with what he says.

"Mr. Stephens says that you can see him and you can arrange to carry whatever amount you wish. We have been trying to get you by phone today and have left the call in, as we want to know to whom the deed should be made at the earliest possible moment.

"Glad you got the place and feel sure that it will make your place more valuable.
"Yours very truly,
"Webb & Webb."

The court found (11) that after receiving the above letter Bertram A. Elliott advised Webb & Webb to make the deed to him and Ray Elliott and that on December 20, 1943, Webb & Webb wrote the Elliotts as follows:

"Enclosed a copy of the Deed on the Burton Brooks 191.83 acres for $5,574.90.

"We have a complete copy for sending to Roeser & Pendleton in order that they may change their records and pay all future rentals and royalty to you.

"Please glance over this and see if it covers—the SW 45 acres sold to R. A. Elliott back in 1895 was described by Creeks and Branches; so is very indefinite—but the Schooler is by Survey field notes, but we do not know how to otherwise describe the 46.83 acres.

"We think the deed will be executed on Tuesday and we shall then be ready to close. Many thanks."

(12) Said copy of the proposed deed, containing a description of the two tracks comprising 191.83 acres, was enclosed with said letter. Said deed contained a recital that the land described contained a total of 191.83 acres of land, more or less, "together with all improvements thereon." The deed recited that the conveyance was made subject to an oil and gas lease dated August 21, 1943, to Roeser & Pendleton, Inc.; that it was agreed possession should be delivered to grantee on January 1, 1944. The court further found (13) that defendant was informed by Floyd Pool at Moran that there was a deed at the bank for him and his wife to sign conveying the land to the Elliotts, and that defendant advised Webb & Webb that defendant and his wife would not sign any deed to Bertram A. El-

liott. (14) That on December 22, 1943, Bertram A. Elliott gave his personal check to Webb & Webb for $5,754.90; that said check would have been paid if it had been presented in due course of business to the Moran bank for payment. (15) That when the offer to purchase was made there was a deed of trust against the land to secure an indebtedness of $3,200, which was not mentioned in the deed sent to defendant for execution. (16) That defendant's son owned some valuable feed troughs and chicken houses and "other personal property" on said land, "there being no provision made concerning its removal, in any of said transactions."

Conclusions of law: "I conclude, as a matter of law, based upon the above findings of fact, that no binding contract for the sale of said land was ever executed, in writing, between the Plaintiffs, and the Defendant; that the minds of the parties never met and that the alleged contract of sale comes within the provisions of the Statute of Frauds, and that Plaintiffs are not entitled to a judgment for specific performance."

Plaintiffs present two points: First, that the writing declared upon, with the aid of other admitted testimony, was sufficient to support the suit for specific performance. Second, that defendant's pleadings do not affirmatively allege the Statute of Frauds as a defense against the contract sued upon, and the judgment, therefore, is without pleadings to support it.

We overrule the second point. We think defendant alleged the Statute of Frauds as a defense. However, there is another reason why we cannot sustain said point. The record shows that the case was tried in the district court by all the parties as if defendant had adequately alleged the Statute of Frauds as a defense. In Texas Employers' Ins. Ass'n v. Marsden, 131 Tex. 256, 114 S.W.2d 858, our Supreme Court held that filing of an answer was waived, where no answer was filed and the case was tried by all parties as if the defendant has filed a general denial.

Plaintiffs say that the question presented under the first point is whether there was a sufficient memorandum of the oral contract made and signed by Brooks, or his lawfully authorized agent, to be enforceable against a pleading setting up the Statute of Frauds as a defense. Assuming that the memorandum is sufficient if Webb & Webb were authorized to execute a con-

tract or memorandum binding on the landowner, the question remains whether said realtors were so authorized. In connection with said point, we call attention to the fact that the trial court found (3) that it was understood between Brooks and Webb & Webb that when they found a satisfactory buyer Brooks would execute his own contract with the buyer, and that said agents had no authority to execute a contract for Brooks. In the realtors' letter of June 19th to defendant they suggested that if there was a crop on the place there would have to be an agreement between the purchaser and the renter. No such agreement is shown. The court further found (5) that when Brooks received said letter he believed the prospective buyer was Overton, with whom defendant and his wife were on friendly terms, and that defendant, believing "that all terms of sale could be agreed upon between them," wrote on the bottom of said letter that he "would take $30.00 for the place * * *," and signed his name. It should be further remembered that the court found (8) that when Brooks received the realtors' letter of December 13th, in which Webb & Webb stated that the prospective buyer "says he will give $30.00 per acre cash with delivery January 1st next, but he does not want you to reserve any royalty or mineral rights," that Brooks, still believing that the prospective buyer was Overton, wrote on the bottom of that letter, "I believe I will let you sell the place for $30.00 cash. Bert Brooks." The court found (7) that Webb & Webb, as Brooks' agents, caused the Overtons to inspect Brooks' land and Brooks told the Overtons that if he ever sold the land at $30 per acre he would sell to them.

There is testimony in the record from both Brooks and Webb & Webb, in substance, that it was understood between them that Webb & Webb only had authority to find a prospective buyer for defendant's land and bring him to the owner so that Brooks could execute his own contract.

▮ The applicable general rule is stated in 12 C.J.S., Brokers, § 20, p. 63, as follows: "Most courts * * * sustain the view that the use of the words 'for sale,' 'to sell,' and the like, in a broker's contract of employment, amount to nothing more than an employment to find a purchaser and to present him to the owner or to conduct negotiations with him, and

does not of itself give the broker any authority to make a binding contract of sale on behalf of the owner."

Plaintiffs' contention is that Webb & Webb were acting as their agents when they wrote the letter of December 13th to defendant and after the letter was returned to Webb & Webb with the notation thereon, "I believe I will let you sell at $30.00 cash. Bert Brooks.", Webb & Webb were, as a matter of law, authorized as Brooks' agents to accept Elliotts' offer. Further, that Webb & Webb were acting as Brooks' duly authorized agents when they wrote the letters of December 16th and 20th to the Elliotts, and, therefore, there was, as a matter of law, a sufficient memorandum in writing executed by Brooks' authorized agents. Plaintiffs contend that if Brooks' notation on Webb's letter of December 13th was not "in fact" an acceptance of Elliott's offer to purchase at $30, then it was sufficient to authorize Webb & Webb to accept such offer, and Webb's letter of December 20th, enclosing a copy of the proposed deed, was sufficient acceptance of Elliott's offer, signed by defendant's duly authorized agents.

▮ After a careful study of the statement of facts, we think the trial court was justified in finding there was no meeting of the minds, and, therefore, no contract. The evidence tends to show that defendant merely intended to discuss with Overton, who he supposed was the prospective buyer and with whom he was on friendly terms, all the details and terms incident to the making of such a contract, and then, if they could be agreed upon, to convey the land to Overton at $30 per acre. Brooks had agreed to sell the land to Overton if he ever decided to take $30 per acre for his land. There was no discussion or understanding with Brooks with reference to the oil and gas lease covering this land. One of defendant's sons had been occupying the land for 16 years, and at all times in question was living on and cultivating said land. He owned hen houses, feed troughs and other property situated thereon. There was no agreement as to removal of such things from the premises. The land was encumbered by a deed of trust to secure an indebtedness of more than $3,000, drawing interest at the rate of 7 per cent per annum, which was not due until January 1, 1945. At the time plaintiffs assert the contract was consummated there had never been any mention, much less

agreement, with Brooks relative to said loan. This was a debt for which Brooks apparently was personally liable. It might have been important to Brooks whether said loan was paid, assumed by the Elliotts, or whether they bought the land "subject to" the debt and lien. The debt was not mentioned in the unsigned deed prepared by Webb. When Webb sent said deed to Elliott he wanted Elliott to check the description of one tract and determine whether it was correct. After Brooks had made the notation on Webb & Webb's letter of December 13th and returned it to Webb & Webb they notified Elliott that he had bought the land. Several days thereafter Elliott delivered to Webb & Webb his check payable to Webb & Webb for the full amount of the purchase price. Although the question of the disposition of the debt secured by a lien on the land had not been mentioned to Brooks, the existence of the debt was known to Elliott. Of course, if the debt was to be assumed by the purchaser or the property was to be conveyed subject to the debt, the check was far too large a sum of money. The correspondence indicates that there was no definite understanding even between Elliott and the lien holder as to the disposition of Brooks' debt secured by a lien on the land. The record indicates at one place that the debtor was a Mr. Stephens. In another place it indicates that Stephens was merely the trustee. The listing of Brooks' land with Webb & Webb was not signed by Brooks. The only things signed by him in connection with the asserted sale and all of the dealings with his agents are the two notations on the bottom of letters written to him by Webb & Webb. On the latter of June 19th Brooks said, "I would take $30.00 for the place * * *." On Webb's letter of December 13th, Brooks wrote: "I believe I will let you sell the place at $30.00 cash." These are the only statements to which his signature was ever affixed in connection with the entire transaction. As shown by the foregoing quotation from 12 C.J.S., Brokers, § 20, p. 63, use of such language in a broker's contract of employment does not of itself constitute an authorization to the agent to execute a contract for the owner. It does not conclusively show a grant of authority to an agent to do more than bring a prospective buyer to the owner so that the owner may make his own contract. In Donnan v. Adams, 30 Tex.Civ.App. 615, 71 S.W. 580, writ refused, it was held that proof that the owner of land made and signed a written description of the land, stating the price, and handed the memorandum to a real estate agent, was not sufficient to show authority in the agent to bind the owner by executing a written contract for sale of land. Under such situation it was held that the trial court was justified in finding that the agent did not have authority to bind his principal.

The court's conclusion that there was no meeting of the minds of the parties and no contract binding on Brooks that could be specifically enforced is sustained by the following authorities: Eisenhower v. Brown, Tex.Civ.App., 4 S.W.2d 627, 628; Brillhart v. Beever, Tex.Civ.App., 198 S.W. 973, 976; Reiser v. Jennings, Tex.Civ. App., 143 S.W.2d 99, 101; La Beaume v. Smith, Albin & Peay, Tex.Civ.App., 247 S.W. 623; J. B. Watkins Land-Mortgage Co. v. Campbell, 100 Tex. 542, 101 S.W. 1078; Sorsby v. Thom, Tex.Civ.App., 168 S.W.2d 873, 874; Central State Bank of Abilene v. Godfrey, Tex.Com.App., 29 S. W.2d 1015, 1018; Lusky v. Keiser, 128 Tenn. 705, 164 S.W. 777, 779, L.R.A.1915C, 400; 17 L.R.A.,N.S., 210, note; 48 A.L.R. 638, 641. See also 49 Am.Jur. 702, 715; 8 Am.Jur. 1016 et seq.; 10 Tex.Jur. 29; Restatement of the Law of Agency, § 53, pp. 133, 134; Radford v. McNeny, 129 Tex. 568, 104 S.W.2d 472; Rips v. Dreibrodt, Tex.Civ.App., 110 S.W.2d 971; 37 C.J.S., Frauds, Statute of, § 283, p. 816; 27 C.J. 385, note.

The Supreme Court in Fisher v. Bowser, 41 Tex. 222, 224, said: "In such cases also there may often be a question of fact arising out of the terms of the authority given, or from the nature of the business followed by the agent, as to the extent of authority given to the agent, and as to how it is to be executed or performed. For if a person be appointed only to make a negotiation for a contract of sale, or to seek a purchaser, as is sometimes the case with land brokers, that would not embrace authority to such agent to execute a written contract of sale for his principal. (Coleman v. Garrigues, 18 Barb., N.Y., 60.)"

The judgment is affirmed.